UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| J.R. SIMPLOT COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>McCAIN FOODS USA, INC.,<br><br>    Defendant.<br>―――――――――――――――――――<br><br>McCAIN FOODS LIMITED,<br><br>    Plaintiff,<br><br>    v.<br><br>J.R. SIMPLOT COMPANY,<br><br>    Defendant.<br>―――――――――――――――― | Case No. 1:16-cv-00449-DCN<br><br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

The Court held a *Markman* hearing on July 11, 2018, to interpret the claims of three patents: McCain's utility patent (United States Patent No. 6,821,540 ("'540 patent")); McCain's design patent (United States Patent No. D720,916 ("'916 patent")); and Simplot's design patent (United States Patent No. D640,036 ("'036 patent")). The Court's interpretation is set forth below.

# II. BACKGROUND

## A. Procedural Background

This case involves both utility and design patents. On October 7, 2016, Simplot sued McCain in United States District Court for the District of Idaho for patent infringement, accusing McCain's TWISTED POTATO product of infringing its '036 design patent for a "[s]piral potato piece" design. McCain denies infringement.

On February 21, 2017, McCain sued Simplot in United States District Court for the Northern District of Illinois for patent infringement, accusing Simplot's SIDEWINDER product of infringing its '916 patent for a "[r]oot vegetable product" design. Simplot denies infringement.

Additionally, McCain accuses Simplot of infringing its '540 utility patent. This patent protects McCain's "[p]rocess for treating vegetables and fruit before cooking," that utilizes pulsed electric field ("PEF") technology to pre-treat fruits and/or vegetables to reduce their resistance to cooking and cutting.

On August 24, 2017, the Northern District of Illinois transferred McCain's case to the District of Idaho and on November 9, 2017, the undersigned consolidated the two cases. Dkt. 40.

## B. Patents at Issue

### 1. The '540 Patent

The '540 patent protects McCain's developed process of using high-energy electric field technology to pre-treat potatoes before cutting and cooking them. Although

McCain did not invent this technology, it "invented" and patented *the process* embodied in the '540 patent.

Prior to McCain's PEF process, potatoes were preheated in a water bath to make them easier to cut before cooking. This preheating step, however, was time-consuming and expensive. McCain developed the process protected by the '540 patent in which potatoes are "pre-treated" with high-energy electric fields, which makes them much easier to cut and provides numerous other benefits. Essentially, a high-energy electric field is "pulsed" over the potatoes (similar to a microwave oven). This process makes the potatoes less resistant to cutting and less likely to break down during cooking. Companies such as McCain and Simplot use PEF technology to process a variety of fruits and vegetables.

### 2. The '916 Patent

The '916 patent is McCain's design patent protecting its root vegetable product known as the TWISTED POTATO. In essence, the TWISTED POTATO is just that: a twisted potato wedge similar to a large, curved French fry.

### 3. The '036 Patent

The '036 patent is Simplot's design patent protecting its spiral potato piece known as the SIDEWINDER. The SIDEWINDER is also a large spiral potato wedge or fry.

## III. LEGAL STANDARD

The Court begins with the first step of the two-step infringement analysis—determining the scope and meaning of the patent claims at issue. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370,

116 S. Ct. 1384 (1996). The construction of a patent is a question of law for the Court to decide. *Id*.; *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). At the same time, the court is not required to construe every limitation present in a patent's asserted claims. *O2 Micro Int'l Ltd*, 521 F.3d at 1359. "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*).

To interpret the claims at issue, the Court must look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).In discerning the legally operative meaning of disputed claim language, such intrinsic evidence is the Court's most important resource. *Id.*

In evaluating the intrinsic evidence, the Court examines first the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. *Id.* Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, so long as the special definition of the term is clearly stated in the patent specification or file history. *Id.*

Intrinsic evidence also includes the prosecution history of the patent, if in evidence, which includes the complete record of all proceedings before the Patent and

Trademark Office (PTO), including any express representations made by the applicant regarding the scope of the claims. As such, the record before the PTO is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein. *Id.*

If the Court can construe the disputed claims from the intrinsic evidence alone, it is not proper to rely on extrinsic evidence "other than that used to ascertain the ordinary meaning of the claim limitation." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001). In the rare circumstance that the court is not able to construe the claims after examining the intrinsic evidence, however, it may turn to extrinsic evidence to resolve any ambiguity. *Id.*

Extrinsic evidence includes expert testimony, articles, and testimony of the inventor. *See generally id.* As with the intrinsic evidence, extrinsic evidence may not be used to "vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Id.*

## IV. ANALYSIS

### A. The '540 Patent

McCain's '540 utility patent protects a process for pre-treating vegetables using high-energy electric field technology. At issue here is only the language of Claim 1 of the '540 patent which recites that the patent is:

> A process for treating vegetables and fruit before cooking in order to reduce their resistance to cutting, characterized by the application of a high electric field directly to the vegetables and/or fruit under conditions such that the resulting increase in the temperature of the vegetables and/or fruit is almost zero or at least sufficiently low as to not amount to a preheating step.

Dkt. 53-2, at 5. McCain's position is that the patent is purposely broad to allow for some flexibility. As a utility patent, McCain asserts that it has patented—and protected—the *process as a whole*, and specific things within that process such as voltage, temperature, and time do not need to be defined. In support of this proposition, McCain points to its own explanation in the patent that "it would be easy for a skilled person to experimentally determine optimal operating conditions" for fruits and vegetables. *Id.*

For its part, Simplot claims that the '540 patent is not broad, but vague, and must be further defined. Simplot alleges that without specifics, anyone using PEF technology would be unable to ascertain if they were infringing on McCain's patent. Simplot claims that McCain uses the '540 patent in certain ways and under certain parameters and that the '540 patent covers those activities, but no more. For example, Simplot argues that its use of PEF technology is quantifiably different than McCain's and is distinguishable.

The parties agree that there are four items at issue in Claim 1. The Court will address each in turn.

First, a brief mention about the construction of patent claims. Claims typically include three sections: the "preamble," the "transition," and the "body." The preamble sets out the type of invention being claimed. Whether the preamble acts as a limit on the scope of the claim is sometimes (as here) contested. The transition is a phrase that links the preamble and the body, such as "comprising," "consisting of," or—in this case— "characterized by." The body then sets forth a series of phrases delineating the structural

limitations, elements, or steps of the invention. Here, Simplot takes issue with the preamble and three phrases in the body of the '540 patent.

### 1. Preamble

| Disputed Clause | McCain's Construction | Simplot's Construction |
|---|---|---|
| "A process for treating vegetables and fruit before cooking in order to reduce their resistance to cutting" | The preamble is limiting and requires that the "application of a high electric field" step occurs before the steps of cutting and cooking. The preamble means: A process for treating vegetables and/or fruit before cooking and cutting to make cutting easier. | No construction necessary. The preamble is presumed not to be a limitation and is readily understood by its plain and ordinary meaning. |

In the '540 patent, the preamble reads as follows: "A process for treating vegetables and fruit before cooking in order to reduce their resistance to cutting." McCain asserts that the preamble is limiting, while Simplot argues that the preamble does not limit the claims. In other words, McCain's construction of the preamble rewrites it slightly to clarify its purpose, while Simplot's leaves it untouched.

"Generally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, the preamble may be limiting "when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention." *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). If the preamble is "necessary to give life, meaning and vitality" to the claim, then the claim preamble should be construed as limiting. *Kropa v. Robie*, 187 F.2d 150, 152 (CCPA 1951). This is determined "on the facts of each case in view of the claimed invention as a whole." *In re Stencel*, 828 F.2d 751, 754 (Fed. Cir. 1987); *see also Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572–73, 40 USPQ2d 1481, 1488

(Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation . . . is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.").

Here, McCain claims that the preamble, of necessity, defines the invention in that it shows how the invention departs from the prior art. Specifically, McCain contends that the preamble illustrates that the invention is a sequential process. This is important because there are other patents which use PEF technology, but which are used for different purposes or in a different order as what is claimed here.[1] McCain asserts that the Court must read the preamble as limiting the claim to the application of PEF technology before both cutting and cooking as that is the whole point of the invention and presumably a part of the reason it was approved—i.e. it differed from other patents (the prior art) in that it applied PEF technology before, rather than after, cutting.

Simplot asserts that no explanation is necessary and that if McCain truly intended to make the patent limiting it should have said "a process for treating vegetables and fruit before cooking *and cutting* in order to reduce their resistance to cutting." Because McCain did not do this, Simplot asserts it has only patented a process for treating

---

[1] As one example, the Vigerstrom patent discloses a process for using PEF technology; however, in Vigerstrom, the inventor used PEF technology on fruits and vegetables *after* they have been cut in order to heat and sterilize the product, whereas here, McCain uses PEF technology on fruits and vegetables *before* cutting and cooking in order to reduce their resistance to the same.

vegetables before cooking (with no thought as to a cutting step) and that the word cutting simply describes an intended use, not a necessary step in the patent.

While the preamble does not say the word "cutting" where Simplot suggests it should be included for clarity, it is clear enough from the rest of the patent that this process was developed in a sequence wherein PEF technology is applied first (before *both* cooking and cutting) to make cutting easier. As explained in the Background of the Invention section of the patent, the whole purpose of the '540 patent is to reduce the vegetables "resistance to cutting." *See* Dkt. 53-2, at 1:28-30, 2:4-6, 2:32-33. Additionally, as already noted, it appears that the Patent Examiner specifically took into account the cutting step as a reason for allowing the '540 patent over prior patents of a similar nature. *See* Dkt. 53-6, at 5. While an Examiner's statements are not binding, they do "provide[] evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

Finally, Simplot asserts that under *Catalina,* an easy exercise that can be used to help determine if a preamble is limiting is to remove the disputed phrase and see whether the deletion affects "the structure or steps of the claimed invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002). Simplot claims that deleting the phrase "before cooking in order to reduce their resistance to cutting" does not affect the steps of the invention. The Court disagrees. If this phrase was removed, there would be no way to determine when "the process for treating fruits and vegetables" is to be performed (relative to cooking, cutting, or anything for that matter) and what the purpose of the process is (for sterilization, resistance to cutting, or something entirely

different). Without the disputed phrase, the '540 patent is left as simply "a process for treating fruits and vegetables" under certain parameters. Contrary to Simplot's position, deletion of the disputed phrase would not just alter the steps or structure of the claimed invention, but would call into question whether there are any steps at all.

For all these reasons, the Court determines that the preamble is limiting and adopts McCain's proposed construction for the phrase "before cooking in order to reduce their resistance to cutting" as meaning "before cooking and cutting to make cutting easier."

### 2. High Electric Field

| Disputed Term | McCain's Construction | Simplot's Construction(s) |
|---|---|---|
| "a high electric field" | an electric field strong enough to make the vegetable and/or fruit easier to cut | 1. An electric field between 45 and 65 V/cm |
| | | 2. To the extent that the term "high electric field" is not limited as indicated by the Examiner, it must be limited to between 30 and 75 V/cm |

Simply put, this is the single largest dispute between the parties. The '540 patent outlines that the PEF technology is applied "by a high electric field directly to the vegetables and/or fruit." Simplot alleges that "high electric field" is vague and must be limited to an electric field range between 45 and 65 V/cm[2]—or at most 30-75 V/cm. McCain, on the other hand, believes there are no numerical limitations on the high electric field, but simply that it must satisfy the purpose of the patent—i.e. the field must be strong enough to make the fruit or vegetable easier to cut.

At the outset of this discussion, the Court notes that Simplot asserts that the term "high" is invalid for indefiniteness, as it sets no parameters on the invention.

---

[2] V/cm—volts per centimeter— is a calculation that measures electric filed strength.

"A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). While most Courts appear to prefer to wait until the summary judgment stage to address validity arguments, this is not a strict requirement. *See e.g. Junker v. Med. Components, Inc.*, No. CV 13-4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017) ("District courts throughout the country have generally been reluctant to consider whether a patent is indefinite at the claim construction phase, rather than at the summary judgment phase.") (collecting cases). *Compare Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1368 (Fed. Cir. 2014) (upholding the district court's judgment of invalidity due to indefiniteness during claim construction).

As to the term "high," the Court declines to entertain an indefiniteness argument at this time. The Court does not make this determination based upon the timing between claim construction and summary judgment, but simply because the Court finds it unnecessary. Both sides have presented voluminous evidence in support of their respective proposed constructions thus providing the Court with sufficient material upon which it can reach a sound determination.

Simplot supports its argument that the '540 voltage range should be limited to 45-65 V/cm for four reasons: (1) language in the patent summary; (2) language from the Patent Examiner; (3) McCain's internal documents; and (4) McCain's representations to the European Patent Office. The Court will summarize each in turn.

### i. Patent Summary

First, Simplot argues that in the Summary of the Invention section of the '540 patent, McCain states that to obtain optimal cutting "an electric field of 46[3] to 65 V/cm [should be] applied . . . during a period of 3 to 5 seconds." Dkt. 53-2, at 2:56-59. Next, in the Description of Preferred Embodiment section of the patent, McCain states that when the technology is used on potatoes "an electric field between 45 and 65 V/cm is applied . . . ." *Id.* at 3:22-24. In the same section—when discussing temperature increases—the same voltage ranges are used as examples. *Id.* at 3:24-30. Simplot contends that all of these references limit the '540 patent to a voltage range between 45 and 65 V/cm.

Simplot does acknowledge that in the Preferred Embodiment section there is an additional reference outlining that "preferably, the electric filed should be between 30 and 75 V/cm approximately." *Id.* at 4:29-31. So while Simplot's seeks to limit the voltage to between 45 and 65 V/cm, it asserts that at most, the '540 patent only protects PEF with a range between 30 and 75 V/cm. Finally, a final reference in Claim 3[4]—although not at issue in this case—states that the process in Claim 1 is "characterized in that an electric field of 45 to 65 V/cm is applied." *Id.* at 4:48-50.

McCain discounts this argument by reminding the Court that its invention is not the *what* (a particular voltage) but the *how* (use PEF technology to reduce cutting

---

[3] Both sides agree that this is a typo and should read 45 to 65 V/cm.

[4] Claim 3 is a dependent claim in the patent. Claim 3 does not limit Claim 1 in and of itself. The Court only refers to it (as will be shown below) in support of its ruling that McCain has never claimed, or used by way of example, *any* range outside of 30-75 V/cm.

resistance before cooking and cutting) and that the '540 patent encompasses all voltages that make that end result possible. In addition, McCain asserts that from the beginning it knew a variety of ranges could be used and included the language in its descriptions that ". . . it would be easy for a skilled person to experimentally determine optimal operation conditions . . .." *Id.* at 4:23-26. McCain asserts that its patent protects any modified range that still achieves the *outcome* the patent protects.

In response to Simplot's evidence—and Simplot's proposed construction as a whole—McCain urges the Court not to redefine things that were not supposed to be defined. *See, e.g.*, *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("[T]he role of a [federal trial judge] in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history[,] if in evidence, and any relevant extrinsic evidence."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). McCain claims that Simplot is injecting things into the '540 patent that are unnecessary and inconsistent with the intent and purpose of the protected process.

### ii. Statements by the Patent Examiner

Second, Simplot asserts that the Patent Examiner's statements support its argument that McCain never intended to use any voltage range outside of 45 to 65 V/cm.

In her "Reasons for Allowance," the Examiner stated that one of the reasons she was allowing the patent to issue was that McCain "has defined what is meant by the high energy electrical filed treatment at page 3, lines 3-32 and at page 4, lines 19-32." Dkt. 53-6, at 5. The references the Examiner cited are from the patent application rather than the patent itself, however, these lines are identical to the lines contained in the patent itself and cited by the Court in the prior section. Importantly, each refers to a range of 45 to 65 V/cm.

McCain does not necessarily address this argument, except to say that a Patent Examiners unilateral statements in a Notice of Allowance do not limit claim scope. While it is true that an Examiner's statements are not binding, *see Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1341 (Fed. Cir. 2016), as the Court previously noted, it does "provide[] evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. At the very least, McCain did not correct, or object to, the Examiner's assertion that high energy electric field was understood—and defined—by the language in the patent, thus appearing to accept it as valid.

### iii. Internal Documents

Third, Simplot references internal R&D documents of McCain's in support of its proposition that McCain itself understood the parameters of the '540 PEF technology were 45 to 65 V/cm. The parties stipulated to the filing of this documents under seal (Dkt. 56), the Court subsequently granted the same (Dkt. 62), and all references to these documents have been redacted from the briefs available to the public. That seal remains

in effect. Accordingly, the Court will attach its summary of this argument in a separate SEALED document filed contemporaneously with this Memorandum Decision and Order.

***

In response to Simplot's references to these documents, McCain argues that internal, confidential documents cannot limit a claim and that the Court should only concern itself with "sources available to the public that [would] show [] a person of skill in the art . . . [what the] disputed claim language [] mean[s]." *Phillips*, 415 F.3d at 1314.

*Phillips*, however, does not explicitly state that the Court can never consider non-public information, but rather that "*because patentees frequently use terms idiosyncratically*, the courts looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* (emphasis added). It appears then that the *Phillips* Court was not excluding non-public information outright, but simply stating that in circumstances where technical or obscure terms were at issue, ordinary sources would be most helpful in understanding the claims.

Furthermore, the Federal Circuit has considered confidential information on appeal from claim construction, summary judgment, and/or trial rulings. *See e.g. Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1320 (Fed. Cir. 2014) (finding that although some of the evidence at issue was "confidential and [could not] be quoted [in the decision]," it was considered in determining infringement); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 761 F.3d 1329, 1343 (Fed. Cir. 2014) (noting that while the Court could not "recount all the confidential details" of certain materials in its decision, the statements

were part of the "ample evidence on record" in support of its conclusion to reverse the District Court).

Additionally, even though the materials are confidential, they were discussed at the *Markman* hearing and can be considered by the Court. *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1240 n.4 (Fed. Cir. 2017) ("Although these pages have been designated as confidential, the information generally contained therein was discussed publically [sic] at oral argument.").

The sealed materials are by no means definitive; however, they do lend credence to Simplot's contention that McCain only ever intended for its patent to cover a voltage range between 45 and 65 V/cm.

### iv. European Patent Office

Fourth and finally, Simplot looks to Europe in support of its argument. When McCain filed its patent for its '540 equivalent with the European Patent Office ("EPO"), the European Patent Examiner originally rejected it on several grounds. First, the patent was rejected based on a lack of novelty over another patent—the Geren patent—which disclosed the use of an electric field "having a duration in the microsecond range." Dkt. 59-7, at 5-8. Second, the Examiner also rejected McCain's claims over the Geren patent and another patent—the Vigerstrom patent—because they "disclose[d] a process for treating vegetables and fruit before cooking in order to reduce their resistance to cutting" and "show[ed] all the features of the subject-matter of claim 1." *Id.* at 5-6.

In light of this rejection, McCain made numerous amendments, *including* limiting the electric field to 30 to 75 V/cm. Simplot again asserts that this is an indication of the

limits of the '540 patent. McCain counters with three arguments as to why the Court should disregard everything that happened in front of the EPO: (1) the changes were required in order to conform with specific European laws not relevant here; (2) because the Examiner required multiple amendments there is no way to know which of the amendments (individually or collectively)—voltage, time parameters, or any of the other amendments—was actually the impetus for the patent's success; and (3) European law is not controlling, nor can it limit a U.S. patent.[5]

While it is true that statements made to a foreign patent authority "do[] not alter the clear import of the claim language, specification, and relevant extrinsic evidence in [a domestic] case," *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011), representations to foreign patent offices should be considered if the material "comprise[s] relevant evidence." *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983). *See also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312 (Fed. Cir. 2014), *overruled on other grounds* by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)( finding that "statements made by [defendant] during prosecution

---

[5] McCain also notes that the U.S. Examiner was aware of all the other patents related to this invention, granted the '540 application irrespective of those concerns, and that the USPTO's decision should govern. This is true. As noted, however, the Examiner specifically stated that one of her reasons for allowance was the fact that McCain "ha[d] defined what is meant by the high energy electrical filed treatment at [references]," Dkt, 53-6, at 5, and each of those references referred to a range of between 45 and 65 V/cm. Thus, it is not clear whether specific voltages were or were not required for the U.S. patent. It does *appear*, however, that the Examiner believed that the '540 patent only utilized a high electric field of 45 to 65 V/cm. Whether she would have granted the patent without those definitions is pure speculation.

of a related Japanese patent further support [the District Court's] construction"); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (finding the "blatant admission by this same defendant before the EPO clearly support[ed] th[e] court's holding"). Thus, while not binding, the proceedings before the EPO again demonstrate how McCain understood its patent.

In response to this—and each argument asserted—McCain reminds the Court that it intended for there to be flexibility all along as evidenced by the language that "it would be easy for a skilled person to experimentally determine optimal operating conditions." Dkt. 53-2 at 4:23-26. Even taking this statement at face value, there is no evidence that McCain intended for these skilled individuals to deviate much outside of the suggested range. In other words, while flexibility was allowed, it appears that McCain meant flexibility in and around the 45 to 65 V/cm range—a tweaking of the specifies as it were—not flexibility that would encompass voltage magnitudes hundreds or thousands of volts higher, let alone all voltages. The sentence that immediately follows supports this concept stating that "preferably, the electric field should be between 30 and 75 V/cm." *Id.* at 4:29-31.

"A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent." *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993). While McCain may not have disclosed its invention narrowly in word, it has done so in practice and the Court cannot accept a high-energy electric field without bounds.

Upon review of all the arguments, the Court finds that the appropriate definition of the term "high electric field" is a voltage range between 30 and 75 V/cm. The Court bases this conclusion on the fact that all available evidence points to the idea that this range—even more specifically 45 to 65 V/cm—was McCain's intent and understanding of the '540 patent's use of PEF technology.

While in isolation, it might be difficult to assert that McCain intended to limit the '540 patent's high electric filed to between 45 and 65 V/cm (or the broader 30 to 75 V/cm); however, when taken as a whole, it is difficult to assert that McCain meant anything else. This is not a situation where there was just a passing reference to, or a single example of, the range of 45 to 65 V/cm. There is a breadth of evidence—the wording of the patent itself, the Patent Examiners comments, McCain's internal documents, and statements made to the EPO—that supports the conclusion that the process embodied in the '540 patent uses a voltage range of between 45 and 65 V/cm, but also allows for some flexibility slightly above and slightly below that range (i.e. 30 to 75 V/cm).

McCain's rebuttal is that all of these are only examples—examples specific to potatoes—and should not be read in isolation or as limiting the parameters of its '540 patent. While they may be examples, they are essentially identical examples. More importantly, they are the only examples given. There simply are no other indications of how the '540 patent's use of voltage is to be understood. It is difficult to accept that these are (collectively) just one example of the '540's intended use, when not a single other

example—of a different voltage range, or another fruit or vegetable—can be found anywhere in the record.

For all of these reasons, the Court adopts Simplot's proposed construction for the term "high electric field" as meaning "an electric field between 30 and 75 V/cm."[6]

3. Under Conditions[7]

| Disputed Clause | McCain's Construction | Simplot's Construction |
|---|---|---|
| "under conditions such that the resulting increase in the temperature of the vegetables and/or fruit is almost zero or at least sufficiently low as to not amount to a preheating step" | under conditions such that the resulting increase in the temperature of the vegetables and/or fruit is almost zero or at least sufficiently low as to not amount to a preheating step, *e.g.*, the heat processing described at column 1, lines 28 through 56 | A processing period between 1 and 10 seconds<br><br>Indefinite |

Simplot first asserts that the words "under conditions" in this disputed clause (like "high electric field") are too broad and must be limited to what the intrinsic and extrinsic evidence suggests was McCain's understanding of its patent—in this circumstance not voltage, but time. Referencing the same fours sources as above, Simplot outlines instances where McCain has indicated that it uses the PEF technology for roughly 1 to 10 seconds. McCain reiterates that the Court should not read specifics into the patent that are not present.

[6] While there are more references to the 45 to 65 V/cm range than the 30 to 75 V/cm range, the Court elects to use the slightly expanded range as this allows for the "flexibility" that McCain claims is built into the patent.

[7] Although this dispute focuses on a whole disputed phrase, there are two arguments within that phrase at issue. The parties have briefed each separately and the Court will devote an individual section—"3. Under Conditions" and "4. Almost Zero"—to each as well.

The problem with Simplot's argument is that it assumes "under conditions" relates solely to time. While the amount of time the high electric field is applied is clearly an important feature, there is no evidence that time is the only "condition" contemplated for in "under conditions." The Court does not dispute, nor does McCain, that 1 to 10 seconds is the *preferred* time that the high electric field should be applied. However, this is simply one factor within the process that should be considered. The physical makeup of the chamber in which the high electric filed is pulsed,[8] water conductivity,[9] frequency,[10] V/cm,[11] and time,[12] are all conditions that are necessary to ensure the invention works as intended. It appears then that the claimed conditions include multiple conditions—not simply time.

If the patent had used a phrase such as "under time parameters," "for a time," or some similar iteration, the Court would have a much easier time accepting Simplot's argument. The analysis would have been very similar to the above discussion regarding voltage because there would be no doubt as to how McCain understood and utilized timing of PEF application in the '540 patent. As it stands, however, it is not entirely clear that time is the only condition in the "under conditions" requirement.

---

[8] Dkt. 53-2, at 3:8-11; 4:45-48.

[9] *Id.* at 3:18; 4:58.

[10] *Id.* at 3:19-20.

[11] *Id.* at 3:20-30; 4:48-50.

[12] *Id.* at 3:20-30; 4:51.

For this reason, the Court rejects Simplot's proposed construction of limiting the time to between 1 and 10 seconds and adopts McCain's proposed construction for the phrase "under conditions"—that it remain as written.

### 4. Almost Zero

| Disputed Clause | McCain's Construction | Simplot's Construction |
|---|---|---|
| "under conditions such that the resulting increase in the temperature of the vegetables and/or fruit is almost zero or at least sufficiently low as to not amount to a preheating step" | under conditions such that the resulting increase in the temperature of the vegetables and/or fruit is almost zero or at least sufficiently low as to not amount to a preheating step, *e.g.*, the heat processing described at column 1, lines 28 through 56 | A processing period between 1 and 10 seconds<br><br>Indefinite |

Next, Simplot claims that the phrase "almost zero or at least sufficiently low as to not amount to a preheating step" is invalid for indefiniteness, as it provides no objective boundaries. For its part, McCain first asserts that indefiniteness should not be addressed until summary judgment, and second, even if the Court takes up the matter now, the phrase is not indefinite because it need not give specifics but only reflect the goal (the how) of the invention which is to eliminate the preheating step. Indefiniteness aside, McCain's proposed construction seeks to add to the claim language a reference to the preheating process found in the patent itself. McCain believes that doing this will help illustrate what the process cannot "amount to" in order to be considered "pre-heating."

As the Court noted previously, while not a strict rule, Courts generally take up challenges of indefiniteness at summary judgment rather than claim construction. *See e.g. Junker v. Med. Components, Inc.*, No. CV 13-4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017) ("District courts throughout the country have generally been reluctant to consider whether a patent is indefinite at the claim construction phase, rather than at the

summary judgment phase.") (collecting cases). Because challenges for indefiniteness require a high burden of proof and have a dispositive effect, Courts prefer to wait until the parties have performed some focused discovery on the matter to ensure that the disputed claim truly has no objective boundaries as understood by the public and those skilled in the art. That is precisely what must occur in this case. While the Court is concerned that under the current language a third-party would have a difficult time understanding the bounds of the '540 patent, there is the possibility that those skilled in the art *would* understand the parameters as written. The Court, therefore, will not reach issues of indefiniteness at this time, but take them up—if presented—at summary judgment.

Although the Court will not address indefiniteness at this time, it is also unwilling to accept McCain's proposed construction. The purpose of claim construction is to define terms so that a jury can better understand the facts at issue. McCain's construction does not necessarily simplify the disputed claim, but rather refers any third-party seeking to avoid infringement to another part of the patent. The Court will not use this construction for two reasons. First, the description McCain refers to is contained in the "Background of the Invention" section of the '540 patent. The cited language outlines the disadvantages of the prior art—the preheating step that occurred prior to the introduction of the '540 patent. This description, however, is essentially the "back story" of the patent, not a technical section such as the "Description of Preferred Embodiment" which outlines—with specifications—the patent's intended use.

Second, the illustration contains approximately 30 lines of text and may create more confusion than clarity. For example, the quoted language discusses what was typically done in the prior art and notes several drawbacks of that process. These drawbacks, however—of texture, color, loss of material, odor, and temperature—are listed in very general terms without specific measurements or details. Again, this language may not help a third-party in understanding if the process he uses would be considered a pre-heating step or not based upon the ambiguous descriptions found in the referenced text.

Arguably, McCain seeks to add a simply reference ("e.g.") to the claim as written, however, the Court is not convinced that McCain's example would be helpful to a jury in understanding the pre-heating step. Accordingly, the Court rejects all proposals and will construe this claim as written for the time being.

## B. The '916 Patent

McCain's '916 patent claims "the ornamental design for a root vegetable product as shown" in Figures 1-7. Dkt. 53-3, at 2-4. McCain admits that its TWISTED POTATO product "embodies the '916 patent." Dkt. 59-4, at 8.

When it comes to design patents, Courts give deference to the physical drawings of the patent rather than a verbal description of the claim. "Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to "construe" a design patent claim by providing a detailed verbal description of the claimed design. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008).

Both Simplot and McCain agree that the Court should construe the '916 patent according to figures 1-7 as shown in the patent. The parties disagree, however, on whether the claimed design requires a *cored* root vegetable product. Simplot urges the Court to add the word *cored* to the verbal part of the claim description, while McCain believes that such language is unnecessary.

Simplot argues the word *cored* is a necessary addition to the claim description based up McCain's response to an interrogatory concerning infringement. Dkt 59-3, at 12-13. Specifically, McCain stated that there were "major differences between the design[s]" of the two products including the fact that its design "has a hole through its center twist axis, whereas [Simplot's] does not." *Id.* Simplot also believes McCain's statement in a prior brief describing its TWISTED POTATO product is further evidence that McCain has conceded this point. In describing its product, McCain noted that its machine "carve[s] out a central cylindrical core of the potato, but that cylindrical core is not used" in the finished product. Dkt. 29-1, at 4, n.3.

McCain argues that while it may be true that the word *cored* accurately describes a feature of its patent, this "does not amount to a legal limitation on claim scope that justifies further verbal elaboration about the drawings." Dkt. 53, at 22.

Simplot reasserted at oral argument—following McCain's admission that the core of the potato is removed from its product—that McCain has all but acquiesced this fact and that the word cored should be added to the claim. The Court understands Simplot's argument, however, admitting that something is an accurate description of the product does not necessarily mean that adjustments to the language of the patent automatically

follow. It is clear from the finished product, the printed models of the product, and McCain's own admissions, that the TWISED POTATO product is produced in a cutting process which eliminates the central core of the potato itself. Specifically listing this fact in the '916 patent, however, is unnecessary.

In its discretion, the Court elects to follow the pattern outlined in *Egyptian Goddess* and rely on the design drawings themselves rather than trying to add verbiage to the language of the patent.

## C. The '036 Patent

Simplot's '036 patent claims "the ornamental design for a spiral potato piece, as shown" in Figures 1-7. Dkt. 53-4, at 2-3. Simplot's SINDWINDER product embodies the '036 patent.

As previously noted, "a design is better represented by an illustration 'than it could be by any description . . ..'" *Egyptian Goddess*, 543 F.3d at 679 (*citing Dobson v. Dornan*, 118 U.S. 10, 14 (1886). Interestingly, unlike McCain's position regarding its own design patent, here, it postures that Simplot's patent must be altered—by adding hundreds of words to the descriptions in an attempt to define the drawings of the '036 patent.

McCain asserts that prosecution history estoppel is relevant here and requires amendment to limit the scope of Simplot's '036 patent. McCain argues that because Simplot canceled other designs (a "smooth, single line" design) prior to the '036 patent's approval, it is now estopped from asserting that the '036 patent encompasses that specific design element. Simplot takes issue with this argument for four reasons. First, Simplot

believes this argument is premature and better left for summary judgment. Second, Simplot claims that it did not disavow anything; it simple altered a drawing to provide clarity at the Examiner's suggesting that the drawings looked somewhat inconsistent. Simplot added the two lines to show depth (visually); not an additional surface requiring verbal explanation. Third, Simplot argues that every case McCain relies upon to support its argument that former designs or early renditions that are rejected are disavowed is either old, not binding, or distinguishable. Lastly, Simplot asserts that McCain's evidence of the single line drawings is inadmissible. These drawings are not part of the current patent and even if they are from the former drawings McCain cites no authority that allows a Court to look at former drawings when it comes to claim construction.

In the first instance, the Court is concerned that McCain's elaborate proposed construction strays from the standard set out in *Egyptian Goddess* that explains the "risk" entailed in detailed descriptions such as this because it places "undue emphasis on particular features of the design and [runs] the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole. *Egyptian Goddess, Inc.*, 543 F.3d at 680.

Second, the Court is concerned with the evidence in support of this argument. The Court agrees that disclaimer or disavowal arguments based upon prosecution history are premature at this time. While there are no strict requirements mandating when "disclaimer" arguments are to be heard, numerous District Courts—including from within this Circuit—have routinely held that these types of arguments (of functionality,

disclaimer, or disavowal)[13] are better addressed during the infringement stage (summary judgment), rather than the construction stage. If there are disclaimer claims here, such will have to wait until summary judgment.

In addition, McCain repeatedly alleges that the Patent Examiner rejected the "smooth, single line" *design*; however, this is not entirely clear to the Court. The Examiner rejected the smooth single *line*—period. In other words, the Examiner rejected the '036 patent because the drawings depicted a single line in one instance and two lines in the other, noting that there was "no support" for this change. Thus, the change was assuredly a drafting requirement to reconcile the different drawings, but whether it was also a "clear and unmistakably" disavowal of a prior design is undetermined (and must, as noted above, be addressed at summary judgment rather than at claim construction).

At the claim construction stage, it is the Court's duty to define terms. The Court is unwilling to put such a microscopic focus on one element of the '916 patent—the single vs double line discrepancy—and require a large overhaul of the patent language that might very well confuse a jury. Additionally, any arguments relative to prosecution history estoppel/disclaimer are premature and will be dealt with when—and if—the Court takes up summary judgment, but cannot be used at this time to support McCain's

---

[13] *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11–CV–01846–LHK, 2012 WL 3071477, at *3 (N. D. Cal. July 27, 2012); *Depaoli v. Daisy Mfg. Co.*, No. CIV.A.07-CV-11778DPW, 2009 WL 2145721, at *5 (D. Mass. July 14, 2009); *Dexas Int'l, Ltd. v. Office Max Inc.*, No. CIVA 6:07CV396, 2009 WL 252164, at *6 (E.D. Tex. Jan. 30, 2009).

argument against construing the claims as depicted and adding such extensive language. Accordingly, like the '916 patent, the Court elects to follow *Egyptian Goddess* and define the '036 patent by figures 1-7 as outlined in the patent itself.

## V. ORDER

The Courts construes the claims as follows:

The '540 patent

1. Preamble – the preamble is limiting and defined as "a process for treating vegetables and/or fruit before cooking and cutting to make cutting easier.

2. "High Electric Field" – defined as "an electric field between 30 and 75 V/cm."

3. "Under conditions" – defined as written.

4. "Almost zero or at least sufficiently low as to not amount to a preheating step" - defined as written.

The '916 patent – defined "as shown is figures 1-7."

The '036 patent – defined "as shown in figures 1-7."


DATED: August 16, 2018

_____

David C. Nye
U.S. District Court Judge